UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 17 CR 611 |
| LABAR SPANN; SAMMIE BOOKER; TREMAYNE THOMPSON; JUHWUN FOSTER; MARCHELLO DEVINE; RONTRELL TURNIPSEED; KEITH CHATMAN; STEVON SIMS; DEANDRE SPANN; MIKAL JONES; ANTONIO DEVINE. | Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Defendants have been indicted on criminal RICO and other related charges. Some of the evidence against them consists of telephone communications intercepted and recorded (wiretaps) by the Chicago Police pursuant to a state court order. Defendants have moved to suppress certain wiretap recordings as obtained in violation of the statutory requirement that the "principal prosecuting attorney" be the applicant for the wiretap. R. 252; R. 264; R. 293. The Court orally denied that motion during a status hearing on August 12, 2019. R. 517. This opinion and order explains the Court's decision.

**Background**

Title III—the federal statute governing authorization of wiretaps—provides in relevant part that:

> The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or

> approving the interception of wire, oral, or electronic communications, may apply to such judge [for a wiretap].

18 U.S.C. § 2516(2). It is undisputed that Anita Alvarez, who was the State's Attorney for Cook County at the relevant time, was the relevant "principal prosecuting attorney." It is also undisputed that Alvarez did not sign the five wiretap applications at issue here, but that the applications were signed by Shauna Boliker, who was the First Assistant State's Attorney at the time. The applications' signature lines indicated that Boliker was signing on Alvarez's behalf.

In opposition to the motion to suppress, the government submitted affidavits from Alvarez and Boliker. Neither of them specifically remembered the applications at issue, but they stated that they had a regular practice for considering and approving wiretap applications. The practice consisted of Boliker briefing Alvarez (in person or over the phone) about the facts underlying the application. Alvarez generally did not review the materials supporting the application. Alvarez frequently delegated authority for signing the application and appearing before the state court judge to Boliker. This delegation was always oral, never in writing. Defendants requested an evidentiary hearing to test the assertions Alvarez and Boliker made in their affidavits.

The Court held a hearing on June 19, 2019, so that Defendants could cross-examine Alvarez and Boliker. Their testimony was in accord with their affidavit statements. *See* R. 453 at 15 (15:2-5); 15 (15:22-25); 18-19 (18:23–19:7); 25 (25:7-12); 50 (50:7-15); 54 (54:1-4); 55-56 (55:18–56:4).

**Analysis**

I.  **Unlawful Intercept**

"In a federal criminal prosecution, federal standards [as opposed to state law] govern the admissibility of evidence." *United States v. D'Antoni*, 874 F.2d 1214, 1218 (7th Cir. 1989). Title III provides the grounds for suppressing wiretap recordings:

> (i) the communication was unlawfully intercepted;
> (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
> (iii) the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a). Relying on the first ground, Defendants argue the wiretaps at issue were "unlawfully intercepted" because the applications were not signed by Alvarez, the "principal prosecuting attorney" of Cook County, as is required by 18 U.S.C. § 2516(2), cited above.

The term "unlawful" is not defined in the statute. Of course, wiretaps that violate the Constitution are unlawful. *See United States v. Giordano*, 416 U.S. 505, 527 (1974). Here, Defendants do not allege a constitutional violation, but violation of § 2516(2). However, "not every failure to comply fully with any requirement provided in Title III . . . render[s] [a wiretap] 'unlawful.'" *United States v. Donovan*, 429 U.S. 413, 433 (1977).

The Supreme Court has held that by using the word "unlawful," "Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the

3

employment of this extraordinary investigative device." *Giordano*, 416 U.S. at 527. The Supreme Court also expressed its "confiden[ce] that the provision for pre-application approval [i.e., § 2516] was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored." *Id.* at 528.

Nevertheless, courts have held that not all "authorization problems arising under § 2516" rise to the "unlawful" level. *U.S. ex rel. Machi v. U.S. Dep't of Prob. & Parole*, 536 F.2d 179, 183-84 (7th Cir. 1976). Rather, because Congress's intent was to create "assurance of a responsible executive determination of the need and justifiability of each [wiretap]," *id.* at 517, the Seventh Circuit and Supreme Court have reversed district court decisions suppressing wiretap recordings when the government has demonstrated that the person statutorily authorized to approve a wiretap "actually approved" it through "personal participation." *Machi*, 536 F.2d at 184; *see also United States v. Chavez*, 416 U.S. 562, 579 (1974) ("When it is clearly established, therefore, that authorization of submission of a wiretap or electronic surveillance application has been given by the Attorney General himself, but the application, and, as a result, the interception order, incorrectly state that approval has instead been given by a specially designated Assistant Attorney General, the misidentification, by itself, will not render interceptions conducted under the order 'unlawful' within the meaning of § 2518(10)(a)(i)[.]").[1]

---

[1] More recently in a case cited by neither side, the Ninth Circuit held that it is "not sufficient for the principal prosecuting attorney to state that he or she is generally aware of the criminal investigation, that he or she authorizes a deputy to seek

4

Here, there is sufficient evidence that Alvarez "personally participated" in the application process and "actually authorized" every wiretap application made on her behalf during her tenure. The fact that she did not sign the applications, and instead delegated signing authority and the responsibility of appearing before the judge to Boliker, does not change the fact that Alvarez personally approved every wiretap application. Her personal approval and authorization of every wiretap application substantially satisfied Congress's concern that there be "responsible executive determination of the need" for exercise of the authority granted under Title III. Satisfaction of this congressional concern means that the wiretaps were "lawful" under §§ 2516 and 2518, and suppression of the recordings is not warranted. The Court notes, however, that more than 40 years ago in a similar case, the Supreme Court admonished the United States Department of Justice that "strict adherence . . . to the provisions of Title III would . . . be more in keeping with the responsibilities Congress has imposed." *Chavez*, 416 U.S. at 580. The State's Attorney's Office would do well to heed this advice in its wiretap application procedure.[2]

---

wiretaps, and that his or her deputy has been authorized to review and present to the court the evidence in support of the wiretaps." *Villa v. Maricopa County*, 865 F.3d 1224, 1234 (9th Cir. 2017), *cert. denied sub nom. Maricopa Cty., Ariz. v. Villa*, 138 S. Ct. 1696 (2018). But in that case, the principal prosecuting attorney approved the wiretap *before* the investigating agent signed the affidavit supporting the wiretap. This temporal discrepancy undermined any argument that the principal prosecuting attorney could have in fact personally participated in authorizing the wiretap application. No evidence as to when the affidavit was signed, or any other analogous circumstance, was presented by the parties here.

[2] Defendants also argue that the recordings should be suppressed because Alvarez and Boliker did not comply with Illinois law providing that the State's Attorney must apply for wiretaps or, if the State's Attorney is unavailable, delegate application authority in writing. 725 ILCS 5/108B-3. Defendants concede that federal law

## II. Good Faith

Even if the wiretaps at issue here were unlawful—which the Court has held they are not—suppression would not be warranted because the applications were made in good faith. In *United States v. Leon*, the Supreme Court held that "[w]hen police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' [also known as 'good faith'] on the subsequently invalidated search warrant." *Herring v. United States*, 555 U.S. 135, 142 (2009) (quoting *Leon*, 468 U.S. 897, 922 (1984)). Here, Defendants do not contend that probable cause was lacking. Instead, they appear to rely on *Leon's* holding that suppression "remains an appropriate remedy if the magistrate or judge in issuing a warrant was *misled* by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." 468 U.S. at 923 (emphasis added). Accordingly, Defendants argue that suppression is appropriate because Alvarez and Boliker "knowingly

---

governs admissibility of evidence in federal court. But they argue that § 2516(2) "mandates compliance with state law," R. 472, by its reference to the attorney "authorized by a statute of that State." The problem with Defendants' argument is that phrase from § 2516(2) merely serves to identify the state prosecutor authorized to apply for a wiretap under federal law. It does not import state law requirements into Title III. And in any event, both the Illinois and federal statutes required Alvarez to be the applicant in the circumstances present here (because she was "available" for purposes of the state law). Of course, there is no question that Alvarez was the attorney "authorized" by Illinois law to apply for the wiretap. The only question here was whether Alvarez was in fact the attorney who made the application. As discussed, the Court finds that she effectively was.

6

procured [the wiretap] in violation of the statute's requirement [that Alvarez be the applicant]." R. 472 at 27.

The glaring omission from this argument is any contention that Alvarez and/or Boliker misled the judge in applying for the wiretap. To the extent Alvarez and Boliker knew that their process for making wiretap applications violated state law, that knowledge did not implicate the substantive basis of their wiretap applications. Their technical violation of the application process was irrelevant to the judge's determination of whether a wiretap warrant should issue. Furthermore, the fact is that Boliker had Alvarez's approval to make the application, and the application states that Boliker was applying on behalf of Alvarez. There is no evidence that the signing judge was deceived in any way about the circumstances of the application process, and there is no evidence that there was any attempt by Boliker or Alvarez or any other law enforcement agent to engage in any deception. *Cf. United States v. Patrick*, 842 F.3d 540, 551 (7th Cir. 2016) (Wood, J. dissenting) ("Deception of the issuing magistrate is just the kind of misconduct sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."). The question addressed above—whether Alvarez applied for the wiretap or properly delegated her authority to apply for the wiretap—is simply irrelevant in these particular circumstances to whether the wiretap was applied for in good faith.

Defendants argue, however, that even if the wiretap was applied for in good faith, "the court-made exception to the court-created exclusionary rule" does not apply

7

"[b]ecause suppression here is a statutory remedy." R. 472 at 21. The Seventh Circuit has not addressed whether *Leon's* good-faith exception applies to Title III's suppression provision. *See Patrick*, 842 F.3d at 552 (Wood, J. dissenting). The circuit courts that have addressed this issue are split in their interpretation of the statutory language and the force of the legislative history. *Compare United States v. Rice*, 478 F.3d 704 (6th Cir. 2007) (holding *Leon* exception inapplicable to Title III); *United States v. Glover*, 736 F.3d 509, 516 (D.C. Cir. 2013) (same); *with United States v. Moore*, 41 F.3d 370, 376 (8th Cir. 1994) (applying *Leon* exception to Title III); *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988) (same); *United States v. Reed*, 575 F.3d 900, 917 (9th Cir. 2009) (same); *United States v. Brewer*, 204 Fed. App'x 205, 208 (4th Cir. 2006) (same).

Title III prohibits use of "evidence in any trial" acquired in violation of the statute and does not expressly provide a good-faith exception. *See* 18 U.S.C. § 2515. But Title III's suppression provision is clearly modeled on the exclusionary rule created by the Supreme Court, and Congress enacted Title III with knowledge of Supreme Court decisions setting forth that rule's scope. The Senate report on the bill stated:

> Section 2515 of the new chapter imposes an evidentiary sanction to compel compliance with the other prohibitions of the chapter. It provides that intercepted wire or oral communications or evidence derived therefrom may not be received in evidence in any proceeding . . . where the disclosure of that information would be in violation of this chapter. The provision must, of course, be read in light of section 2518(10)(1) discussed below, which defines the class entitled to make a motion to suppress. It largely reflects *existing* law. It applies to suppress evidence

8

> directly (*Nardone v. United States*, 302 U.S. 379 (1937)) or indirectly obtained in violation of the chapter. (*Nardone v. United States*, 308 U.S. 338 (1939)). There is, however, no intention to change the attenuation rule. *See . . . Wong Sun v. United States*, 371 U.S. 471 (1963). Nor generally to press the scope of the suppression role beyond *present* search and seizure law. *See Walter v. United States*, 347 U.S. 62 (1954).

S. Rep. No. 90-1097, at 2184-85 (1968) (emphases added). In *United States v. Rice*, the Sixth Circuit understood this passage's use of the words "existing" and "present" to prohibit future Supreme Court decisions, like *Leon* (which was decided 15 years after Title III was enacted), from altering Title III's scope. 478 F.3d at 713. By contrast, in *United States v. Moore*, the Eighth Circuit read this passage to "express[] a clear intent to adopt suppression principles developed in Fourth Amendment cases" into the future. 41 F.3d at 376.

This Court finds the Eighth Circuit's reading of the legislative history to be the more persuasive of the two. The exclusionary rule was first created by the Supreme Court and then adopted by Congress. The Senate report cited a number of Supreme Court cases defining the contours of the exclusionary rule to the date of enactment. In this context, the words "existing" and "present" do not imply that Congress rejected any future developments in the Supreme Court's application of the exclusionary rule. Rather, those words, along with the breadth of cases cited, indicate that Congress was adopting the *entirety* of the exclusionary rule as applied by the Supreme Court. Without express rejection of future developments, this Court does not see a reason to understand that to be Congress's intent. Indeed, it would be unreasonable for

9

Congress to adopt a judicial doctrine but reject any further developments of that doctrine, leaving Title III with a judicially undeveloped exclusionary rule.

Moreover, Supreme Court case law existing at the time of Title III's enactment foreshadowed the good-faith exception. In *Leon*, the Court explained that if law enforcement officials act in good faith to secure evidence, suppression of that evidence will not serve to deter future similar conduct. *Leon* was born of a long line of decisions expressing concern that the exclusionary rule not be permitted to "impede unacceptably the truth-finding functions of judge and jury." 468 U.S. at 907. Prior to *Leon* and the enactment of Title III, the Supreme Court had held that the "primary justification for the exclusionary rule is the deterrence of [unlawful] police conduct," not "redress [of] the injury to the privacy of the victim." *See Stone v. Powell*, 428 U.S. 465, 486 (1976); *see also Linkletter v. Walker*, 381 U.S. 618, 637 (1965) ("In rejecting the *Wolf* doctrine as to the exclusionary rule the purpose was to deter the lawless action of the police and to effectively enforce the Fourth Amendment. That purpose will not at this late date be served by the wholesale release of the guilty victims."); *Elkins v. United States*, 364 U.S. 206, 217 (1960) ("The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."). Since the Supreme Court expressed this reasoning in caselaw prior to Title III's enactment, it is unlikely that Congress intended to exclude it (the reasoning underlying the *Leon* decision) from Title III's suppression provision.

## Conclusion

For these reasons, the Court denied the motions to suppress, R. 252; R. 264; R. 293.

ENTERED:

_Thomas M. Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: September 5, 2019

11