UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 17 CR 611-1 |
| LABAR SPANN | Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Labar Spann and others are charged in a nine-count racketeering indictment that includes allegations of murder, robbery, witness tampering, extortion, distribution of controlled substances, and more. Some of the evidence against Spann consists of telephone communications that were obtained through judicially-authorized wiretaps. Spann moves to suppress all evidence from those wiretaps, R. 804, and relatedly seeks copies of transcripts from the criminal trial of Officer Xavier Elizondo, R. 806. For the following reasons, Spann's motion to suppress is denied while his motion for transcripts is granted.

**Background**

In 2012 and 2013, the Cook County State's Attorney's Office ("CCSAO") intercepted wire communications as part of its narcotics investigation into Defendant Spann and the Four Corner Hustlers gang. Five phones were wiretapped—four were allegedly used by Spann while the fifth supposedly belonged to someone else. Before each phone was tapped, the CCSAO was required to submit wiretap applications to the presiding judge of the Criminal Division of the Cook County Circuit Court. Each application included an affidavit that explained why there was probable cause to

1

believe that the targeted phone was being used in connection with criminal activity, and each affidavit was signed by a Chicago Police Department officer. Officer Xavier Elizondo signed the affidavit for Target Phones 1, 2, 3, and 5; Officer Kristi Battalini signed the affidavit for Target Phone 4. The affidavit for Target Phone 1, which was signed by Officer Elizondo, served as a starting point for the affidavits attached to Target Phones 2-5. All affidavits were signed in 2012 and 2013.

Fast forward to May 10, 2018, when a grand jury indicted Elizondo for submitting false search warrant affidavits and stealing drugs and cash from properties he searched. Concerned how the indictment might affect the wiretap affidavits in this case, attorneys for Spann and other defendants raised the issue with the Court and asked that sealed documents filed in Elizondo's criminal case (pending before a different court) be disclosed. *See* R. 461. The Court directed attorneys for the government to review the sealed documents in Elizondo's criminal proceedings and determine whether Elizondo's wrongful conduct occurred at the same time that he signed the affidavits for Target Phones 1, 2, 3, and 5. The attorneys conducted that review and represented to the Court that the none of the sealed filings in Elizondo's criminal case indicated that he engaged in wrongdoing before 2017. The Court also reviewed the sealed filings and confirmed the government's representations. *See* R. 461.

After that review, however, additional information came to light concerning the timeline of Elizondo's criminal behavior. More specifically, prosecutors at Elizondo's sentencing offered the testimony of a confidential informant who stated

2

that Elizondo asked her to lie to a judge about two search warrants in 2012—the same year he signed affidavits for Target Phones 1-3. *See* R. 882 at 8. The government's sentencing memorandum also said that the informant started working with Elizondo in 2010, suggesting that Elizondo may have been engaged in illegal conduct before, during, and after he signed the affidavits at issue in this motion.[1] R. 804 at 5.

In light of these revelations, Spann now seeks to suppress all evidence obtained through the wiretaps of Target Phones 1-5. Spann advances three arguments. First, Spann claims that he has standing to suppress the evidence derived from the wiretaps. Next, Spann contends that an evidentiary hearing is required under *Franks v. Delaware*, 438 U.S. 154 (1978), to show that Elizondo made false statements in the affidavits supporting the wiretaps. Third, Spann argues that the affidavits failed to establish that the wiretaps were necessary.[2]

---

[1] Attached to Spann's reply brief is a copy of a letter from the prosecutor in Elizondo's criminal trial that is addressed to Elizondo's attorneys. R. 896-1. The contents of the letter suggest that Elizondo asked the informant to lie to the judge in 2010, not 2012. Whether the relevant events took place in 2010 or 2012 is less important than the fact that Elizondo reportedly asked the informant to lie to the judge around the same time that he signed the affidavits at issue in this case.

[2] Several defendants in this matter previously moved to suppress the wiretap evidence on different grounds, arguing that certain recordings were obtained in violation of Title III's requirement that the "principal prosecuting attorney" be the applicant for the wiretap. *See United States v. Spann*, 409 F. Supp. 3d 619 (N.D. Ill. 2019) (discussing 18 U.S.C. § 2516(2)). The Court denied the motion in part because the principal prosecuting attorney's failure to personally sign the wiretap applications did not render the intercepts unlawful. *Id.* at 623.

Before the Court considers each argument in turn, a few additional pieces of background information should be noted. Of relevance here, the wiretaps challenged by Spann were obtained as part of Operation High-Five, a drug trafficking investigation conducted by law enforcement authorities that focused on Spann and the Four Corner Hustlers. Operation High-Five followed two similar investigations: Operation 5K in 2003 and Operation Hog Tied in 2010. Operation 5K investigated the alleged involvement of Spann and the Four Corner Hustlers in more than a dozen murders, while Operation Hog Tied focused on Spann and the gang's alleged trafficking of drugs on the west side of Chicago. Spann was incarcerated during Operation Hog Tied.

**Analysis**

**I. Standing to Challenge Wiretaps**

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 provides "a comprehensive scheme for the regulation of wiretapping and electronic surveillance." *Gelbard v. United States*, 408 U.S. 41, 46 (1972); 18 U.S.C. §§ 2510-22. It establishes "special safeguards against the unique problems posed by misuse of wiretapping and electronic surveillance." *United States v. Calandra*, 414 U.S. 338, 355 n.11 (1974). For example, to comply with Title III, the government must not only satisfy the requirements of probable cause and particularity, but must also demonstrate a need for electronic surveillance and conduct it in a way that minimizes invasions of privacy. *See* 18 U.S.C. § 2518.

4

Title III also includes a suppression mechanism. Indeed, Title III prohibits any "part of the contents of" unlawfully intercepted communications and "evidence derived therefrom" from being used as evidence at trial, hearing, or other legal proceeding. 18 U.S.C. § 2515. Any "aggrieved person" may move to suppress such evidence. 18 U.S.C. § 2518(10)(a). An "aggrieved person" is someone "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11).

Spann asserts that he is an "aggrieved person" under the statute and thus has standing to suppress the evidence at issue here because he was either a party to the communications or named as a "targeted interceptee" in the wiretap applications for Target Phones 1-5.[3] *See* R. 804 ¶ 5. The government takes a different position, arguing that being named as a "targeted interceptee" in a wiretap application does not confer standing to challenge communications from that wiretap. *See* R. 882 at 9. According to the government, Spann has standing to challenge only communications to which he was a party. *Id*.

At first blush, Seventh Circuit case law suggests that the government has the better argument. Under *United States v. Thompson*, a defendant does not have standing "to seek suppression of evidence gathered from" wiretapped phone calls to

---

[3] As explained above, the wiretap applications were submitted by the Cook County State's Attorney's Office and approved by a state court judge. Spann nevertheless challenges the wiretaps under Title III (a federal statute), and federal law governs admissibility of evidence in federal court. This Court therefore reviews Spann's arguments in the context of Title III and the cases that have interpreted its provisions.

5

which he was not a party. 944 F.2d 1331, 1339 (7th Cir. 1991). The Seventh Circuit affirmed this principle in *United States v. Vargas*, 116 F.3d 195, 196 (7th Cir. 1997), when the court held that the defendant had only limited standing to object to wiretaps placed on someone else's phone. The government's brief cites both cases approvingly, *see* R. 882 at 9, as do many district courts in this circuit. *See, e.g.*, *United States v. Smith*, 2016 WL 4611382, at *2 (N.D. Ill. Sept. 6, 2016); *United States v. Alvarez-Carvajal*, 2019 WL 5639156, at *2 (S.D. Ill. Oct. 31, 2019).

But neither *Thompson* nor *Vargas* discuss (or even mention) Sections 2510(11) or 2518(10)(a), which set forth the standing requirements under Title III. As stated above, Section 2518(10)(a) provides that "[a]ny aggrieved person," may move to suppress intercepted communications under certain circumstances, while Section 2510(11) defines an "aggrieved person" as someone "who was a party to any intercepted wire, oral, or electronic communication *or a person against whom the interception was directed*." (emphasis added). As other courts have noted, it is difficult to conclude that the phrase "against whom the interception was directed" does not include the target of the surveillance, even if that person was not a participant in the captured conversation. *See United States v. Scurry*, 821 F.3d 1, 7 (D.C. Cir. 2016) ("aggrieved person" includes "a target of the wiretap"); *United States v. Oliva*, 705 F.3d 390, 395 (9th Cir. 2012) (holding that defendant had standing to suppress communications because his "conversations were the target of the surveillance" even if he was not always a participant); *United States v. Apple*, 915 F.2d 899, 905 (4th Cir. 1990) (noting that a party has standing if the "government's efforts were directed

6

at him"); *United States v. Giraudo*, 225 F. Supp. 3d 1078, 1083 (N.D. Cal. 2016) (concluding that defendant was an "aggrieved person" even though his voice was not captured on every intercept). Any other interpretation of Section 2510(11) would be in tension with the most natural reading of "against whom the interception was directed," and would suggest that the ordinary meaning of "directed" does not apply in the wiretap context. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000) (reminding courts to "give effect, if possible, to every clause and word of a statute"). At a minimum, Title III accords standing to people other than those who were parties to unlawfully intercepted communications, otherwise the clause "against whom the interception was directed" would not be doing any work. *See Giraudo*, 225 F. Supp. 3d at 1082. And as a practical matter, the government's position that only parties to a communication have standing under Title III leads to an odd result in which a person against whom an intercept is to be used has no mechanism to challenge its legality simply because that person was not a participant to the conversation.

There is more the Court could say on this issue. But doing so is unnecessary for purposes of this motion, because even if the Court assumed that Spann had standing to challenge every relevant communication, he still fails on the merits. As explained in the following sections, Spann does not make the required showing to obtain a *Franks* hearing, and the affidavits in question established that wiretaps were necessary to acquire relevant evidence.

7

## II. *Franks* Hearing

As mentioned, Spann seeks a *Franks* hearing to show that Elizondo made false statements in the affidavits supporting the wiretaps. In *Franks v. Delaware*, the Supreme Court held that a defendant may obtain a hearing to present evidence challenging an affidavit's truth. 438 U.S. at 172. To obtain such a hearing, however, the defendant must first make a "substantial preliminary showing" that (1) the affidavit contained a false statement; (2) the affiant made the statement intentionally or recklessly; and (3) the statement was material or necessary to the finding of probable cause. *Id.* at 171-72.

Importantly, this showing must contain more than conclusory allegations and a defendant cannot rely on mere factual errors in the affidavit. *United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013). Indeed, a defendant "must identify specific portions of the affidavit as intentional or reckless misrepresentations," and he "should submit sworn statements of witnesses to substantiate the claim of falsity." *United States v. Harris*, 464 F.3d 733, 738 (7th Cir. 2006) (citing *Franks*, 438 U.S. at 171). "This burden is substantial, and *Franks* hearings are rarely required." *United States v. Johnson*, 580 F.3d 666, 670 (7th Cir. 2009) (citation omitted). Although *Franks* was based on an affidavit submitted in support a search warrant, courts have applied the *Franks* framework to affidavits submitted in support of a wiretap application. *See United States v. Mandell*, 833 F.3d 816, 823 (7th Cir. 2016).

Spann argues first that a *Franks* hearing is necessary because any affidavit signed by Elizondo must be subjected to judicial review and considered potentially

8

corrupt. R. 804 ¶¶ 14-15. Under Spann's view, the fact that Elizondo was convicted for lying to judges in other cases is a sufficient basis for a *Franks* hearing in this case. The Court can appreciate Spann's distrust of Elizondo, but a *Franks* hearing requires more than a healthy dose of skepticism. As stated, a *Franks* hearing is proper only if Spann can make a substantial preliminary showing that: (1) the affidavit *in this case* contained a false statement; (2) the statement was made intentionally or recklessly; and (3) the statement was material to the finding of probable cause. *See Franks*, 438 U.S. at 171-72 (emphasis added). Additionally, Spann must identify specific misrepresentations in the affidavit. *Id* at 171. Challenging an affidavit as a whole, without pointing to a specific statement, does not trigger a *Franks* hearing. *See United States v. Souffront*, 338 F.3d 809, 823 (7th Cir. 2003) (affirming decision not to grant *Franks* hearing where defendant "failed to identify any false statement in the affidavit"). Spann's first argument accordingly fails.

Spann argues next that the information in the affidavits regarding his life and participation in a drug trafficking organization is false. R. 804 ¶¶ 16-17. He contends that Elizondo's narrative is "uncorroborated, embellished and one-sided," and serves no relevant or material purpose other than to detail Spann's alleged gang affiliation. *Id*. ¶ 16. He specifically points to Elizondo's assertion that Spann controlled a drug trafficking organization at the same time law enforcement conducted Operations Hi-Five and Hog Tied. *Id*. ¶ 17. Spann claims that there is no credible evidence he was engaged in any drug transactions during either investigation, and points out that he

9

was in the custody of the Illinois Department of Corrections during the Hog Tied investigation and prosecution. *Id.*

It is true that Spann was incarcerated during Operation Hog Tied. *See* R. 804-1 at 24. But that does not necessarily make Elizondo's statement untrue. In fact, the Target Phone 1 affidavit describes a phone call Spann made from jail in which he told an associate that he needed him "to represent Spann on the street because Spann had no one else on the street at the time to represent him." *Id.* at 24. Spann does not seem to challenge the phone call, what was allegedly said, or the fact that it was made while Operation Hog Tied was underway.[4] And besides, even if Elizondo's statement was not true, Spann still fails to make a substantial preliminary showing, as he must, that Elizondo made that statement intentionally or recklessly. *See Johnson*, 580 F.3d at 671 (no *Franks* hearing in part because there was "no evidence that [the affiant] was aware" of the inaccurate statements in the affidavit).

Spann also takes issue with the affidavits' description of Operation 5K. *See* R. 804 ¶ 18. He complains that Elizondo's "historical rendering of Operation 5K and 'involvement of sixteen (16) homicides', relies on a murder charge against Spann wherein he was acquitted and a 'review of reports' that were unattached to any prosecution for any additional murder." *Id*. Spann's argument is somewhat confusing, but as best the Court can tell, Spann is not calling into the question the veracity of the Operation 5K description. Instead, he is bothered by its inclusion in the affidavit,

---

[4] According to the affidavits, Operation Hog Tied was initiated in 2010 and the phone call between Spann and the associate allegedly occurred on December 2, 2010. *See* R. 804-1 at 14, 24.

10

and being frustrated by a statement is not the same as calling it untrue. Furthermore, and as noted, the affidavit includes an important point about the murder charge against Spann—namely, that he was found not guilty. *See* R. 804-1 at 23. Thus, this is not a situation where a *Franks* hearing is warranted because an officer omits critical information from the affidavit. *See Harris*, 464 F.3d at 738 ("We have interpreted the holding of *Franks* to also apply to omissions.").

In any event, even if Spann has made a preliminary substantial showing that Elizondo intentionally or recklessly made false statements, a *Franks* hearing is still unwarranted because "there remain[ed] sufficient content" in the affidavits to support "a finding of probable cause." *Franks*, 438 U.S. at 171-72; *see also Harris*, 464 F.3d at 738 (instructing courts to eliminate any false statements from an affidavit and determine whether probable cause still existed). Indeed, the 57-page Target Phone 1 affidavit begins with a two-page introduction, part of which sets forth a summary of the investigation into Spann and his co-conspirators. *See* R. 804-1 at 11-13. The affidavit then discusses an interview between CPD Police Commander Michael Cronin and a named member of the Four Corner Hustlers who identified Spann, his role in the gang, and the geographical area that Spann allegedly controlled. The affidavit goes on to describe, in detail, how investigators: (1) conducted covert surveillance of Spann and others, (2) organized undercover purchases of heroin in locations believed to be controlled by Spann, (3) reviewed recorded jail calls between Spann and co-conspirators, (4) interviewed several cooperating sources, and (5) analyzed pen register information for telephone numbers

11

allegedly belonging to Spann. Suffice it to say, even if the Court assumed that the few statements identified by Spann were false, there was still probable cause to believe that the target phones were being used to conduct illegal activities. *See United States v. Jarding*, 2002 WL 1905533, at \*2 (N.D. Ill. Aug. 19, 2002) ("Probable cause exists when the totality of the circumstances reveals a reasonable probability of criminal activity.").

None of this should be construed as the Court sweeping Elizondo's wrongdoing under the rug. There is no dispute that Elizondo was convicted of lying, nor is there any question that he breached the public's trust. And no reasonable person can disagree that Elizondo's credibility has been seriously tainted. But in order to obtain a *Franks* hearing, Spann must make a "substantial preliminary showing" that Elizondo made false statements in the affidavits supporting the wiretaps, and did so intentionally or with a reckless disregard of the truth. He must also show that the such statements affected the probable cause determination. For the reasons stated above, Spann has not done so.

Understandably, Spann would like to know more about the events that led to Elizondo's conviction. To that end, the Court grants Spann's motion for copies of transcripts from Elizondo's criminal trial. *See* R. 806. These transcripts are provided to Spann in addition to the Elizondo-related discovery that the government recently turned over. Should Spann identify information in those documents that cures the deficiencies described in this opinion, Spann may seek leave to re-file his motion for a *Franks* hearing. But in the

meantime, absent any showing that Elizondo intentionally or recklessly made false statements in the affidavits for Target Phones 1, 2, 3 and 5, Spann's motion is denied.

### III. Necessity Requirement

Spann's final argument is that evidence from the wiretaps should be suppressed on the grounds that the government failed to show, when applying for judicial authorization to conduct the surveillance, that the wiretaps were "necessary" under 18 U.S.C. § 2518(1)(c). That provision of Title III requires the affidavit in support of the wiretap application to include "a full and complete statement" concerning whether or not other investigative methods: (1) have been tried and failed; (2) reasonably appear unlikely to succeed, if tried; or (3) reasonably appear to be too dangerous. *United States v. Santiago*, 905 F.3d 1013, 1023 (7th Cir. 2018) (quoting 18 U.S.C. § 2518(1)(c)).[5] Because these considerations are set forth in the alternative, the government need only establish one of the three. *United States v. Fudge*, 325 F.3d 910, 918 (7th Cir. 2003). The necessity requirement is "*not* intended to ensure that wiretaps are used only as a last resort in an investigation, but rather that they are not to be routinely employed as the initial step in a criminal investigation." *Santiago*, 905 F.3d at 1023 (citation and quotation marks omitted) (emphasis in original).

Accordingly, the government's burden of demonstrating that it complied with Title III's necessity requirement "is not great," *United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006), and "substantial deference" is given to the judge who approved the surveillance, *United States v. Zambrana*, 841 F.2d 1320, 1329 (7th Cir. 1988).

---

[5] The same requirement is in Illinois's wiretap statute. *See People v. Stroud*, 911 N.E.2d 1152, 1166 (Ill. App. Ct. 2009) ("[T]he necessity provision in [the Illinois wiretap statute] mirrors the necessity provisions in the federal wiretap statute . . .").

Necessity has been found where investigators are "having trouble fingering other members of the conspiracy." *United States v. Farmer*, 924 F. 2d 647, 652 (7th Cir. 1991). Necessity has also been found where a wiretap would allow the government "to ascertain the extent and structure of the conspiracy," *United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995), and where surveillance techniques other than a wiretap would "likely alert the subjects to the investigation" of its existence, *United States v. Ceballos*, 302 F.3d 679, 683-84 (7th Cir. 2002).

Spann claims that the affidavit for Target Phone 1 showed that several investigative techniques less intrusive than a wiretap had been successful. *See* R. 804 at ¶¶ 27-28. Instead of continuing to pursue those techniques, Spann argues, the government decided to take the "totally unnecessary" route of surveilling telephone calls. *Id*. ¶¶ 27. Spann also argues that the affidavits contain a "litany of conclusory and un-substantiated assertions," "boilerplate generalizations," and "statements lacking any [relevant] details." *Id*. ¶ 29.

The record refutes Spann's assertions. The affidavits explained, in substantial detail, why traditional surveillance tactics had been ruled out or tried and failed. For example, the affidavits discussed how physical surveillance of Spann and others had provided law enforcement with valuable information, but also cautioned that more aggressive forms of physical surveillance would backfire because the targets used counter-surveillance tactics to avoid police detection. *See* R. 804-1 at 58-61,113-116, 163-168, 231-233. To this point, the affidavits specifically mentioned how Spann and associates often switched cars, used police scanners, and cut through traffic at high rates of speed. *Id*. The

14

affidavits also explained the limited utility of pen registers and trap and trace devices[6], noting that they had been used in the investigation but could not identify the source of the narcotics or establish proof of the alleged conspiracy. *Id.* at 62-63; 117-19; 169-70; 234-35; 287-88.

Search warrants and confidential informants were also referenced in the affidavits. The Target Phone 1 affidavit explained that a search of Spann's residence would alert the targets of the investigation to its existence and hamper law enforcement's ability to learn the identity of additional co-conspirators. *Id.* at 64*; see also id.* at 119, 170-71, 235-36, 288. Furthermore, several informants had assisted the investigation, but their contributions were limited since they could not fully identify the size and scope of the alleged conspiracy. *Id.* at 64-65; *see also id.* at 119-120, 171, 236, 289. The affidavits also explained how Spann and others could deter future informants from cooperating with law enforcement by physically threatening them. *Id.* at 65. Finally, the affidavits discussed trash searches and witness interviews. Trash searches were unlikely to be successful because Spann lived in a multi-unit building and his co-conspirators lived with family and friends. *Id.* at 65, 120-21, 172, 237, 290. Witness interviews were unlikely to be successful as well because witnesses might provide false information out of loyalty to

---

[6] As the Seventh Circuit explained in *United States v. Terry*, "[a] pen register records the telephone numbers of outgoing calls made from the monitored phone, while a trap and trace device records the telephone numbers of those calling the phone. Neither method records conversations; both compile only numerical data." 572 F.3d 430, 431 (7th Cir. 2009).

the Four Corner Hustlers or otherwise alert Spann of the investigation. *Id*. at 66, 121, 172-73, 238, 290.

In short, the affidavits provided a great deal of specific information demonstrating that wiretaps were necessary. Moreover, the wiretaps were not the "initial step" of the investigation into Spann and others. *See Santiago*, 905 F.3d at 1023. Law enforcement sought them only after employing other investigatory tools, such as physical surveillance, pen registers, trap and trace devices, and confidential informants. The Court therefore concludes that the government established the necessity of the wiretaps.

## Conclusion

For the reasons stated above, the Court denies Spann's motion to suppress. R. 804. Spann's motion for transcripts, R. 806, is granted. Should Spann identify information in the transcripts or in other documents that cures the deficiencies described in this opinion as they relate to the veracity of the wiretap affidavits, Spann may move for leave to re-file his motion seeking a *Franks* hearing. The renewed motion must explain how the new information cures the issues described herein.

ENTERED:

*Thomas M Durkin*
_____
Honorable Thomas M. Durkin
United States District Judge

Dated: March 10, 2021