**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

UNITED STATES OF AMERICA

           v.

LABAR SPANN

No. 17 CR 611

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

A jury convicted Labar Spann of racketeering conspiracy (Count I), two murders in aid of racketeering (Counts II and III), and extortion (Count IV). The jury also found that two additional murders formed the basis of Spann's racketeering conduct. Spann has filed a motion for acquittal on all counts pursuant to Federal Rule of Criminal Procedure 29. The motion is denied.

**Legal Standard**

A defendant may challenge the sufficiency of the evidence to sustain a guilty verdict against him by filing a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. A defendant faces "a nearly insurmountable hurdle" in contending that the jury had insufficient evidence to find him guilty. *See United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015). The court must "afford great deference to jury verdicts, view the evidence in the light most favorable to the jury's verdict, and draw all reasonable inferences in the government's favor." *United States v. Brown,* 973 F.3d 667, 681 (7th Cir. 2020). The jury's verdict may be set aside on the grounds of insufficient evidence "only if no rational trier of fact could have agreed with the jury." *Id.*

### A.     The Enterprise

Under the RICO statute, it is illegal for a person "associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). In other words, the primary elements of a RICO charge are: (1) an agreement; (2) an enterprise; and (3) a pattern of racketeering activity. *See Brown,* 973 F.3d at 682.

Spann argues that the government failed to prove the "enterprise" element of the RICO charge because the evidence "established chaos rather than enterprise." According to Spann:

> Witnesses described a loose collection of individuals acting independently, often victimizing one another, with no hierarchy, no initiations, no rules, no meetings, no dues, and no unified purpose during the time period in which most of the criminal activity was alleged. This was not proof of a functioning enterprise. No proof of a structure or continuity was introduced. Different individuals from a variety of street gangs would come together to commit specific crimes, then separate. No significant evidence of continuity or coordinated purpose was offered. While it is not essential the evidence of meetings, rules, hierarchy, etc. be introduced, the absence of that evidence, along with the hodge-podge of different gangs, shows the lack of any purpose beyond enriching themselves in the immediate present.

R. 1838 at 7-8.

Spann is correct that the evidence showed that the Four Corner Hustlers were divided into quarreling factions. But the existence of factions within an enterprise does not mean the enterprise does not exist. *See United States v. Olson*, 450 F.3d 655, 667-68 (7th Cir. 2006) (multiple factions within the gang did not make unreasonable

the jury's finding that the larger gang was the relevant enterprise); *Menzies v. Seyfarth Shaw LLP*, 197 F.Supp.3d 1076, 1093 (N.D. Ill. 2016) ("[A] single 'association-in-fact' enterprise can even exist when its members and associates constitute opposing factions."); *United States v. Orena*, 32 F.3d 704, 710 (2d Cir. 1994) (finding that internal divisions did not undermine the existence of a single "association-in-fact" enterprise under RICO).

And in this case, despite these factions, a wealth of evidence was presented to the jury indicating the existence of the alleged Four Corner Hustler enterprise. Witness testimony was consistent that: Spann and his associates always considered themselves to be Four Corner Hustlers; their association was based on their membership in the Four Corner Hustlers; and their crimes were committed for the purpose of enriching themselves and bringing notoriety to themselves as Four Corner Hustlers. The government summarizes and reviews this evidence in their brief. *See* R. 1864 at 5-16.

At least ten different witnesses testified not only about the existence of the Four Corner Hustlers but also that Spann was a member and leader of the Four Corner Hustlers. Witnesses such as Marvin Allen, Shaun Jackson, Anthony Buckner, Ricky Fountain, and Mike Miller explained that they were, at times, themselves members of the Four Corner Hustlers and identified Spann as a fellow member. Witnesses who were members of other gangs, such as Ronnie Allen, Ezekiel McDaniel, Darius Franklin, Maurio Young, Demetrius Harris, Martise Nunnery, and Antonio Devine, explained that they associated with Four Corner Hustlers and,

3

again, that Spann was a Four Corner Hustler. None of these witnesses testified that Spann ever stopped being a Four Corner Hustler, or that they ever heard Spann renounce his membership in the enterprise. Notably, Spann highlighted his association and leadership of the Four Corner Hustlers by posting on Instagram a tribute to the gang's former leaders. *See* Gov. Ex. 300J.

Spann's enterprise was also identifiable because it was organized around a limited geographic area and common purposes. Multiple witnesses testified to growing up around Pulaski Avenue, Polk Street, and Lexington Avenue, and explained this was the heart of the Four Corner Hustlers' territory. In a March 2015 Instagram post, Spann posted a video of himself explaining that he was born and raised on the 3900 block of Lexington and cursing anyone not from that block. *See* Gov. Ex. 506E; Gov. Ex. 300L. The evidence showed that Spann's enterprise was organized around control of this geographic area.

Spann and his associates controlled this geographic area through the common purposes of murder, robbery, and extortion. A primary purpose of the enterprise was to establish and promote their reputation for violence and instill fear in others. The jury heard evidence that Spann and the Four Corner Hustlers committed four murders in just three years. This included the contract murders of Willie Woods and Rudy Rangel, which Spann took on to further the reputation of the Four Corner Hustlers for violence and instill fear in others.

Spann and the Four Corner Hustlers also sold drugs they stole from other drug dealers. They robbed and extorted drug dealers they knew would not report them to

4

the police. The Four Corner Hustlers then resold the drugs on the street. The jury heard a recorded call in which Spann, who was in jail, ordered his younger brother nick-named "Mike Mike" to sell drugs and manage one of his blocks. Gov. Ex. 505. The jury heard about the ongoing war over drug territory between Spann and Kenny Johnson's crew of Four Corner Hustlers.

In addition to murders and drug dealer robberies, Spann and the Four Corner Hustlers robbed non-criminal civilians. The jury heard evidence that Spann and the Four Corner Hustlers organized and executed the robbery of the Steady Stylin' barbershop and the extortion of Kelvin Freeman at his car lot.

As the fear of Spann and the Four Corner Hustlers grew in the community, they could simply demand money without resorting to overt violence. Spann and his associates could drop in on a legitimate business and walk away with $2,000; Spann could call a woman and demand that her son give him a particular gun; Spann could have other grown men pleading with him not to interfere in their territory. Mike Miller testified that he would ride around with Spann and people would just hand over money out of fear, because of the violent reputation of defendant and the enterprise. Tr. 460-61.

Spann and his associates wanted their victims' community—criminal and law-abiding citizens alike—to know about these crimes. For example, co-defendant Rontrell Turnipseed bragged about the gang's violent reputation on Instagram with reference to Spann as the leader. *See* Gov. Ex. 301H. Turnipseed was a core member of defendant's enterprise in its later years. The jury could reasonably infer that

Turnipseed was promoting the Four Corner Hustlers enterprise in order to keep rivals in fear of Spann and his associates.

Without objection from Spann, the jury was given the Seventh Circuit pattern instruction regarding the "enterprise" element. *See* R. 1815 at 27; R. 1840 at 271 (Tr. 4165). The jury considered the evidence and, in accordance with this instruction, found the government had proved that the Four Corner Hustlers were the relevant enterprise and that Spann participated in and led that enterprise. If the jury believed that Spann's faction was the relevant enterprise, as opposed to the greater Four Corner Hustler gang, they could have found Spann not guilty for that reason. Spann's counsel made this argument to the jury and the jury rejected it. Drawing all reasonable inferences in the government's favor, the jury's findings that the government had proven the existence of the Four Corner Hustlers enterprise, and that Spann participated in that enterprise, were not unreasonable.

## B.      Pattern of Racketeering Activity

Spann argues that the government failed to prove a pattern of racketeering activity because the government simply proved a series of "isolated events." R. 1838 at 13. According to Spann, the evidence shows only "acts Spann allegedly committed with others [but which] were neither horizontally nor vertically related to acts committed by other alleged coconspirators," such that they did not constitute a pattern but "were unrelated crimes committed by individuals who did not act together toward a common objective of furthering the Four Corner Hustlers." R. 1838 at 14.

This argument ignores the evidence that Spann repeatedly committed murder, robbery, and extortion with the same people over a twenty-year period. Most of these crimes occurred within the community of people who dealt illegal drugs in and around the limited geographic area where Spann and his associates operated. The evidence also showed that Spann and his associates, such as Sammie Booker, Tremayne Thompson, Juhwun Foster, Jasper Davidson, and Antonio Devine, all considered themselves Four Corner Hustlers and were associated in that enterprise for the purpose of committing these crimes. All of these individuals (other than Jasper Davidson who was deceased by the time of the indictment) were Spann's co-defendants before pleading guilty. The same people committing the same crimes under the same circumstances over a long period of time is strong evidence from which the jury could find a pattern of racketeering activity.

Citing Supreme Court precedent, Spann points out that "an agreement to commit a predicate offense is not equivalent to an agreement to participate in a RICO conspiracy." R. 1838 at 15 (citing *Boyle v. United States*, 556 U.S. 938, 944 (2009)). This is true as far as it goes. But Spann was not charged with committing a single offense. And he was not charged with committing multiple isolated offenses with different people. He was charged with a continuous series of acts of murder, robbery, and extortion, with the same small group of associates, all of whom testified that they were associated with each other because they were Four Corner Hustlers. Contrary to the implication of Spann's argument, the jury was not asked to determine whether participation in a single act constituted agreement to participate in a pattern of

7

activity. Instead, the evidence showed that Spann orchestrated a pattern of crimes among a small group of associates over an extended period of time within the same community of murderers, robbers, extortionists, and illegal drug dealers.

Spann's most specific argument that his alleged crimes were not part of a pattern related to the Four Corner Hustler enterprise concerns the murder of Maximillian McDaniel. Spann argues that "under the government's theory of the case," McDaniel's murder "had nothing to do with the Four Corner Hustlers, gang activity, or Four Corner Hustler territory," but rather the murder was a "'hit' ordered to silence a witness against Spann's father [and] his father's criminal organization," i.e., the Black Souls gang. R. 1838 at 14. For that reason, according to Spann, McDaniel's murder "might have aligned with the objectives of the Black Souls enterprise run by [Spann's father], but it bore no relationship to the Four Corner Hustlers." *Id.* at 15.

Spann's conclusion that McDaniel's murder bore *no* relationship to the Four Corner Hustlers does not follow from the fact that the murder also served to silence a witness against Spann's father. It is possible that both are true, and it was reasonable for the jury to reach that conclusion. As discussed above, the evidence presented to the jury at trial demonstrated that Spann was in the business of violent crimes. He made a living by running an organization that committed murders, robberies, and extortion. Establishing and publicizing (at least in Chicago street gang circles) a reputation for violence made it easier to successfully commit these crimes.

8

Nothing could be more effective to enhance that reputation than having a witness killed, even if someone related to a different gang.

Additionally, the evidence showed that McDaniel had become close to Spann and the Four Corner Hustlers, and McDaniel's cooperation with law enforcement was a threat, not just to Spann's father, but also to Spann and the Four Corner Hustlers. Here, the evidence showed that orchestrating McDaniel's murder "killed two birds with one stone" from Spann's perspective, and both were equally significant. While murdering McDaniel constituted a favor for a family member, it was also squarely within and related to the purposes of the Four Corner Hustlers enterprise.

### C.      Murder

Spann argues that the government failed to prove his responsibility for the murders for which the jury found him guilty in Counts II and III (Willie Woods and Rudy Rangel, respectively), and the murders which the jury found were additional predicates of his racketeering activity (Maximillian McDaniel and George King). But contrary to Spann's argument, the evidence showed that Spann, as the leader, set the enterprise's agenda. All four murders maintained Spann's leadership position and enhanced the reputation of the Four Corner Hustlers as purveyors of violent crimes. The jury reasonably found that Spann orchestrated the four murders for these purposes, and thus that he was legally "responsible" for the murders. *See* Jury Instruction No. 35, R. 1815 at 37 ("Under Illinois law, a person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he

9

knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense.").

### 1.    McDaniel

It was reasonable for the jury to find Spann liable for McDaniel's murder because: (1) McDaniel's brother Ezekial testified that Spann told him he had McDaniel killed, *see* Tr. 938-41; and (2) law enforcement officers testified that Spann made contradictory statements about his involvement in McDaniel's murder, thereby implicating himself in the murder, *see* Tr. 998-99; 1016-19; 1026-28. Specifically, Spann eventually admitted that he was one of the last people to see McDaniel alive, and he resorted to implicating one of his own associates, Jasper Davidson, as the killer, in order to deflect responsibility himself. It was easy for Spann to implicate Davidson because by that time Davidson himself had been murdered.

Spann argues that the circumstances of Ezekial's testimony about Spann's confession make it unbelievable. But Ezekial was cross-examined with all these facts, and the jury chose to credit Ezekial's testimony despite the potential inconsistencies. And none of the inconsistencies is so great that Ezekial's testimony is unbelievable as a matter of law.

Spann's briefs do not address the evidence of his incriminating statements to law enforcement regarding McDaniel's murder. His statements to law enforcement serve to bolster Ezekial's testimony that Spann confessed to the murder. All this evidence taken together was more than sufficient for the jury to reasonably find Spann responsible for McDaniel's murder.

### 2. King

Unlike Ezekial McDaniel's testimony that Spann confessed to responsibility for Maximillian McDaniel's murder, there was no testimony at trial that Spann admitted to the murder of George King. There is, however, substantial evidence that Spann ordered and orchestrated the murder.

Witnesses Anthony Buckner and Darius Franklin testified at length that King's murder was one of a series of retaliatory actions that occurred in a turf war between Spann and his rival Kenny Johnson. Franklin testified that about a week before King's murder, Spann told him that one of his low level drug sellers, nicknamed "Hoop Dreams," had been beaten by someone from Kenny Johnson's crew, and that Spann was angry about it, largely because he understood it to be an encroachment on his drug selling territory. *See* Tr. 1701-09. In response, Franklin joined Spann, Spann's lieutenant named Jasper Davidson, and two of Spann's primary gunmen named Juhwun Foster and Tremane Thompson, in traveling to Kenny Johnson's territory to shoot at Kenny Johnson's associates. *See* Tr. 1710, 1715-16. Shortly afterwards, Spann was shot in the leg as he drove by that same territory. *See* Tr. 1719. Considering these circumstances, it was reasonable for the jury to conclude that Spann ordered the murder of George King in retaliation.

Regarding the details of the planning and execution of the murder, Franklin testified that he was tasked by Davidson with acquiring a gun, which Franklin testified he obtained from a person named Kenny Wood. Tr. 1720-27. Franklin also testified that at this same meeting Davidson assigned Foster and Thompson to be the

11

gunmen. *Id.* The jury heard testimony from multiple witnesses that Davidson was Spann's primary lieutenant, so it was reasonable for the jury to infer that an order from Davidson constituted an order from Spann, particularly in the context of planning a murder in retaliation for Kenny Johnson's actions against Spann and his enterprise.

Franklin testified further that on the day of the murder Davidson instructed him to "peep the scene," meaning perform surveillance of the relevant block to ensure that one of Kenny Johnson's people was out selling drugs. Tr. 1730. After reporting back to Davidson, Franklin testified that he continued to circle the block in his car and eventually he saw: (1) Davidson drop off Foster and Thompson; (2) Foster and Thompson walk through an alley; and then (3) Foster and Thompson shoot George King in the head. Foster and Thompson then ran down the block and jumped in Davidson's car, and Franklin followed them in his car to Franklin's cousin's house where they stashed the murder weapons. Tr. 1730-48.

Spann called Kenny Wood to testify that he did not provide Franklin a gun. Spann also called an investigator who timed the route Franklin testified to driving while Foster and Thompson shot King. Spann argues that this timing shows that Franklin could not have witnessed King's murder as he testified.

Regarding the asserted conflict between Franklin's testimony and that of Kenny Wood, the jury was entitled to credit Franklin's testimony that he obtained the murder weapon from Kenny Wood rather than Wood's denial. This is especially true given that Wood was a felon who could not lawfully possess a weapon at the

12

relevant time. Thus, if Wood admitted that he provided a gun to Franklin, he would have admitted to criminal possession of a gun. Tr. 4105. Wood's testimony was also called into question because of significant other impeachment. In any event, the jury might have believed Kenny Wood and found that Franklin was mistaken about where he obtained the weapon, but nevertheless believed the rest of Franklin's testimony regarding Spann's connection to the murder. Whether Kenny Wood provided the gun to Franklin is relevant only to Franklin's credibility and does not undermine Franklin's substantive testimony that was more material to Spann's responsibility for the murder.

Similarly, the jury was not required to find that Spann's investigator's performance of the route Franklin testified to driving was the only possible way to drive that route. The jury may have determined that the investigator's route failed to account for differences in Franklin's driving speed and Thompson and Foster's walking speed, and that the exact route taken by the investigator differed in material ways from the route Franklin described. At bottom, the investigator's testimony does not make it impossible for Franklin to have witnessed the King murder in the way he testified.

In sum, the jury heard evidence that George King was murdered in retaliation for Spann and his crew being assaulted and shot. The jury heard evidence that Spann's lieutenant directed the murder. The jury heard evidence that Spann's gunmen committed the murder, using the same gun they would use in another murder just nine days later. This subsequent murder was the murder of Willie Woods,

13

discussed below, which Franklin testified Spann admitted to ordering. All this evidence is a sufficient basis for the jury to find that Spann solicited King's murder and so was responsible for it.

### 3. Willie Woods

The evidence showed that Willie Woods was a leader of the Black Souls gang. The evidence also showed that Spann was solicited by Wood's rivals to murder Woods. By successfully orchestrating Woods's murder, Spann enhanced the reputation of the Four Corner Hustlers and maintained his position as leader of that enterprise. *See* 18 U.S.C. § 1959(a) (criminalizing murder "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity").

Franklin testified that Spann told him in advance that Woods was going to be killed and invited him to the location to watch. Franklin then testified that he went to that location and witnessed Foster and Thompson murder Woods. Tr. 1785. Franklin's account of the murder materially matched the accounts given by Woods's girlfriend and brother who also witnessed the murder and testified at trial. *See* Tr. 1785-96 (Franklin); Tr. 1221-37 (Woods's girlfriend); 1253-65 (Wood's brother). Woods's brother also identified Thompson and Foster as the gunmen. Tr. 1265; Gov. Ex. 1400. And again, ballistics evidence showed that one of the guns used to kill Woods was the same gun used to kill King.

Spann argues that there are too many inconsistencies in Franklin's testimony for it to be credible. Spann also highlights differences in Franklin's testimony compared to that of Woods's girlfriend and brother. But Franklin was cross-examined

14

with all of these facts and the jury chose to believe Franklin. None of the inconsistencies is so great to have required the jury to disregard Franklin's testimony as a matter of law. And although there were some differences in the testimony of Franklin and Woods's girlfriend and brother, they were materially consistent, which served to bolster the credibility of Franklin's testimony, and give the jury reason to believe Franklin's testimony that Spann orchestrated Woods's murder.

### 4. Rudy Rangel

The evidence showed that Rudy Rangel was a leader of the Latin Kings gang. The evidence also showed that Spann was solicited by Rangel's rivals to murder Rangel. By successfully orchestrating Rangel's murder, Spann enhanced the reputation of the Four Corner Hustlers and maintained his position as leader of that enterprise. *See* 18 U.S.C. § 1959(a) (criminalizing murder "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity").

Martise Nunnery was convicted of Rangel's murder in state court. Nunnery testified in this case that he was contracted to kill Rangel, and that he in turn subcontracted the job to Spann and the Four Corner Hustlers. Franklin corroborated Nunnery's testimony, explaining that he was present when Nunnery discussed paying Spann for killing Rangel. Tr. 1845-47. Spann's associate, Mike Miller, also corroborated Nunnery's story, testifying that Spann expected to receive money from Nunnery for Rangel's murder. Tr. 3633-3635. Nunnery testified that Spann recruited Donnell Simmons, another Four Corner Hustler, to be the shooter. Tr. 2518-19.

15

Nunnery testified that he and Spann drove Simmons to the location where he shot Rangel. *See* Tr. 2525-35.

Nunnery had also recruited his associate John Coleman to locate Rangel. Coleman, who was also convicted of Rangel's murder in state court, testified against Spann in this case. He corroborated Nunnery's testimony regarding the details of how Rangel's murder was accomplished. He also testified that when he was in jail with Spann, he heard Spann complain that he had not been paid for Rangel's murder. Tr. 2264.

In addition to this witness testimony, Spann's statements to law enforcement implicated himself in Rangel's murder and materially corroborated Nunnery's testimony. In a November 14, 2003 interview with the Cook County State's Attorney's office, Spann admitted that he had been targeting Rangel, although for a robbery, not a murder. Tr. 2428. Spann admitted that both Nunnery and Simmons were involved with this plan, and that they drove to the location of Rangel's murder that day it occurred. Tr. 2428. Spann claimed, however, that Rangel was mistakenly killed in a robbery gone bad. Tr. 2429. It was not unreasonable for the jury to determine that Spann's statements corroborated the testimony of Nunnery and other witnesses, while also disbelieving Spann's assertion that the murder was unintended.

The reasonableness of these findings is further supported by Spann's apparent admission to his involvement in the murder on Instagram. Eleven years after the murder, Spann wrote to a well-known rapper and claimed that he was "the one who had the murder on [Rangel]," and asking the rapper to mention it in a song. Tr. 2713;

16

Gov. Ex. 300S. Rangel had been somewhat well-known for his association with famous rap musicians, one of whom created a song and music video in commemoration of Rangel's death, which was played to the jury. In light of Rangel's association with famous rap musicians, Spann's attempt to enhance his infamous reputation with mention in a rap song, is further evidence of his responsibility for the murder and its relevance to the reputation of the Four Corner Hustlers and Spann's leadership role in that enterprise.

Spann argues that the Court should find this evidence insufficient as a matter of law because, according to Spann, Nunnery is not credible and his testimony and Coleman's testimony were contradictory. Nunnery was duly impeached with all the facts Spann raises in his brief, and the jury chose to believe Nunnery anyway, a choice that was within the jury's province and not unreasonable. Further, Coleman and Nunnery agreed on the material facts, i.e., that Coleman, Nunnery, Simmons, and Spann were responsible for planning and executing Rangel's murder. Nunnery and Coleman disagreed about details regarding the order of events leading up to the murder. But they agreed about how the murder was executed. Moreover, Rangel was murdered in 2003. It is not surprising that there is some disagreement in the memories of those involved. The jury reasonably focused on the facts material to the murder and not the details of the relationships among the perpetrators. The disagreements in their testimony are an insufficient basis to overturn the verdict against Spann regarding Rangel's murder. And it is not surprising that the jury resolved any disagreements in favor of finding Spann responsible for the murder

17

considering Spann apparently later sought credit for the murder in communication with a famous rapper.

### D. Extortion & Robbery

#### 1. Kelvin Freeman

Kelvin Freeman testified that he had rejected several demands from Spann for money. Later, Spann's associate Thompson and several other Spann associates showed up at Freeman's used-car business and threatened violence in order to force Freeman to give them the money Spann had sought earlier. *See* Tr. 3333-48. Freeman's testimony was corroborated by security video and the testimony of another of Spann's associates, Antonio Devine, who also participated in the extortion. *See* Tr. 3477-99. Devine testified that they gave the money they stole from Freeman to Spann who then divided it amongst the entire crew. Tr. 3499.

Spann argues that Freeman's testimony is not credible because there was no video evidence to corroborate Freeman's testimony of Spann's earlier visits. But Freeman testified that his security cameras only saved seven days' worth of data, and he had hoped Spann would stop bothering him without further intervention. Tr. 3364-65. In any case, while Freeman's failure to save the earlier video might be a reason to question his testimony, it is not a basis to find that crediting his testimony is unreasonable as a matter of law. With Freeman's testimony corroborated by the video evidence and the testimony of Devine who participated in the extortion, it was entirely reasonable for the jury to find Spann responsible for this extortion.

### 2. Ricky Fountain

Testimony at trial showed that Spann attempted to extort a defendant in a state court criminal case, named Ricky Fountain, by threatening to convince the primary witness, named Demetrius Harris, to implicate Fountain in the charged crime. Both Fountain and Harris, as well as several other witnesses, testified that this occurred. This was sufficient evidence for the jury to find that Spann attempted to extort a defendant in a state court criminal case.

Tod Urban, an attorney who at times represented Spann, was also Fountain's attorney during the state court trial. Fountain testified that Spann communicated the extortion demand to Urban. But Urban testified in this trial that no such demand was communicated to him. Spann argues that Urban's contradiction of Fountain's testimony, as well as various differences in the testimony of other witnesses, made it unreasonable for the jury to find that Spann had attempted to extort Fountain.

True, the testimony regarding this incident differed as to the amount of money demanded and precisely who said what and when. However, all witnesses agreed that the extortion attempt created a chaotic and loud scene at the county courthouse, which reasonably explains why the witnesses disagree on some of the details of the incident. Moreover, many of the witnesses, except for Urban, testified that Spann's demand for payment from Fountain in exchange for favorable testimony was the origin of the disturbance at the courthouse that day. Additionally, contrary to Urban's testimony, the transcript from the state court proceedings shows that Urban himself notified the judge on the case that Spann had informed him that Harris was going to

19

change his story. Tr. 2734; *see also* Tr. 3835. While this is not direct evidence that Urban was aware of an extortion attempt, it shows that Urban had greater awareness at the time of Spann's actions during this incident than he acknowledged when he testified in this trial. In light of all the testimony heard by the jury, it was reasonable for the jury to disregard Urban's testimony and find that Spann attempted to extort Fountain.

### 3.     Barbershop Robbery

Franklin testified that Spann told him that Spann, Davidson, Foster, Thompson, and another of Spann's associates, Sammie Booker, staked out the Steady Stylin' barbershop to rob it. Tr. 1815. Later, Foster, Thompson, and Booker committed the robbery and were caught by police. Tr. 1817-18. Franklin testified that Thompson hid the stolen jewelry before he was arrested, and that Thompson called Davidson from jail to tell him where it was. Spann, Davidson, and Franklin then recovered the jewelry and arranged to return some of it. Tr. 1821-22, 1827. Franklin's testimony was corroborated by Spann's own statements in recorded conversations, in which he stated that his "most valuable players" had been arrested on the barbershop robbery and that he had been in contact with the target of the robbery to return some of the stolen jewelry. Tr. 2927-28.

In addition to Franklin's testimony, five victims of the robbery testified that three men robbed customers of barbershop of money and jewelry. They also testified that two of the three men had guns. The five victims later identified the robbers as Booker, Thompson, and Foster. Tr. 1504-06.

Spann argues that it was unreasonable to find him responsible for the barbershop robbery because Franklin's testimony was not credible. Spann's argument is based on Franklin's testimony that, after Thompson was arrested, he called Davidson from jail and told him where to find the stolen jewelry. Spann argues that this testimony is not credible because the "police officers who chased and apprehended Thompson" testified "in no uncertain terms that they never lost sight of Thompson and searched the area where he was arrested" but "found no jewelry or money at the scene." R. 1838 at 25. While this difference in testimony raises questions, it does not make it impossible that Thompson was able to hide the jewelry such that it was not found by the police. Moreover, Spann himself stated that he had been in contact with the target of the robbery, which corroborates Franklin's account. Contrary to Spann's argument, the totality of the evidence was sufficient for the jury to find Spann responsible for the barbershop robbery.

## Conclusion

For these reasons, Spann's motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 [1838] is denied.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated:  April 18, 2026

21